**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-22852-ALTMAN**

**ANDRE PAUL-NOEL III**,

    *Plaintiff*,

*v.*

**MIAMI-DADE COUNTY**, *et al.*,

    *Defendants*.

_____/

## <u>ORDER</u>

Andre Paul-Noel III is a state pretrial detainee and a self-proclaimed "Catholic devotee on a kosher faith-based diet." Amended Complaint [ECF No. 17] ¶ 8. One day, Paul-Noel's family sent him some "religious beads . . . from a botanica store." *Id.* ¶ 9. When jail officials denied Paul-Noel his beads because they "could be used as weapons," *id.* ¶ 10, he sued under 42 U.S.C. § 1983 in Florida's Eleventh Judicial Circuit, alleging violations of federal and state law against three Defendants—a corrections captain, the jail's chaplain, and the county. *See generally* State-Court Complaint [ECF No. 1-1]. The Defendants timely removed the case here. *See* Notice of Removal [ECF No. 1].

After Paul-Noel amended his complaint, the Defendants filed a Second Motion to Dismiss ("MTD") [ECF No. 18],[1] in which they argue that Paul-Noel's claims should be dismissed with prejudice *both* because they're insufficiently pled *and* because they're barred by several immunity doctrines. *See generally* MTD. Paul-Noel filed a Response [ECF No. 23], and the Defendants replied [ECF No. 24]. After careful review, we **GRANT in part** and **DENY in part** the MTD.

---

[1] We denied as moot the Defendants' First Motion to Dismiss [ECF No. 3] when we allowed Paul-Noel to file an amended complaint. *See* Order Granting Leave to File [ECF No. 16].

## BACKGROUND

Before he was detained at Turner Guilford Knight Correctional Center, Paul-Noel "was a devoted member of the Catholic community" who "attended Saturday school[ ] and mass[.]" Am. Compl. ¶ 8. On July 12, 2024, Paul-Noel asked Chaplain James Martin if Martin could give him "religious beads specifically for a Catholic." *Id.* ¶ 9. Chaplain Martin responded that he "no longer [gave] them out" and advised Paul-Noel to have his family send religious beads on his behalf—specifically, a "neck[lace] and bracelet directly from a botanica store." *Ibid.* Chaplain Martin also explained that, once Paul-Noel received them, the beads "could not [be] w[orn] . . . outside of [his] cell . . . per [Miami-Dade Corrections and Rehabilitation ("MDCR")] policy." *Ibid.* Relying on that guidance, Paul-Noel "had [both] religious items . . . sent to [his] facility." *Id.* ¶ 10.

Ten days later, the beads arrived at the prison from the botanica. But Paul-Noel "received a rejection paper by the mail clerk," who'd been told by Captain Regina Shaw that the facility wouldn't let Paul-Noel have the beads because they "could be used as weapons." *Ibid.* Paul-Noel also learned that the facility hadn't actually "examined" the beads he'd ordered. *Id.* ¶ 13. Instead, it had rejected the beads based on their "packaging"—a prohibited "padded envelope[ ]" marked as containing a "non-paper item." *Ibid.* After Paul-Noel filed "several complaints and grievances," Chaplain Martin gave him a "loaner" plastic rosary. *Ibid.* Chaplain Martin also explained that the wooden beads had been rejected because they hadn't been "sent to [Chaplain Martin] directly." *Ibid.* At no point, however, had Chaplain Martin instructed Paul-Noel to send the beads directly to him, nor had he advised Paul-Noel of "the kinds of material[s]" MDCR's mail and packaging policy allowed. *Ibid.* Plus, during this period, Paul-Noel observed that, while "Muslims throughout each MDCR facility possess wooden prayer beads," he was denied a wooden prayer bead "of his choosing." *Id.* ¶ 24.

Later placed in administrative segregation, Paul-Noel requested religious services, including "Catholic mass." *Id.* ¶ 15. But, between July 17, 2025 and August 19, 2025 (the day he filed the

Amended Complaint[2])—none of Paul-Noel's requested services had been held. *Ibid.* He was told that he couldn't participate in mass "due to [a] lack of [male] volunteers," even though (Paul-Noel says) the facility routinely supports "religious gatherings . . . despite gender . . . classification" and despite the fact that "females" in "administrative segregation" receive religious services. *Ibid.* And Chaplain Martin, he observed, has hosted sessions "for different religions." *Ibid.* Paul-Noel says that he also hasn't been given the chance to meet with a Catholic religious leader; he's only met with Chaplain Martin once "to discuss religious beads." *Id.* ¶ 21. He has noticed, however, that a "rabbi ha[d] . . . visited [his] . . . housing unit for one [ ] inmate" during this time. *Id.* ¶ 15.

So, Paul-Noel filed the Amended Complaint against Chaplain Martin, Captain Shaw, and Miami-Dade County for violations of federal and state law, seeking $200,000 in compensatory and punitive damages, a declaratory judgment, and a permanent injunction. *See id.* at 22.

## THE STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10

---

[2] "[A] *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing," and "[w]e assume, absent evidence to the contrary, that a prisoner delivered a filing to prison authorities on the date that he signed it." *Daniels v. United States*, 809 F.3d 588, 589 (11th Cir. 2015) (internal quotation marks omitted). Paul-Noel signed his Amended Complaint on August 19, 2025.

(11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

"Although *pro se* complaints must be liberally construed," *Heard v. Nix*, 170 F. App'x 618, 619 (11th Cir. 2006), we may not assist a *pro se* plaintiff in constructing "a theory of liability from facts never alleged, alluded to, or mentioned" in the complaint, *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). Instead, "to prevail on a particular theory of liability, a party must present that argument to the district court." *Ibid.*; *see also GJR Inves., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("Yet even in the case of *pro se* litigants this leniency does not give a court license to serve as de facto counsel for a party."), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## THE CLAIMS

We'll start by clarifying the scope of Paul-Noel's claims. In the end, we construe Paul-Noel's Amended Complaint as asserting *twelve* different claims against the Defendants under 42 U.S.C. § 1983. Here's how we've broken those down:

**Individual Constitutional Claims**. Paul-Noel has advanced *four* constitutional claims against Captain Regina Shaw and Chaplain James Martin in their individual and official capacities: *two* counts under his "First Amendment right[ ] to freely exercise his religious beliefs" and *two* counts for violations of his "Fourteenth Amendment" rights. *Id.* ¶ 50. The Defendants, however, misconstrued Paul-Noel's First and Fourteenth Amendment claims, treating the Amended Complaint as presenting free-exercise claims under both the First and Fourteenth Amendments. They're right that, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment," and "not the more generalized notion of

substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (Rehnquist, C.J.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Because the First Amendment's Free Exercise Clause guards against the Defendants' alleged interference with Paul-Noel's religious practices, we'll analyze his free-exercise claims under the First Amendment and *not* the Fourteenth Amendment's Due Process Clause. *See Porter v. Thigpen*, 2024 WL 1243005, at *6 (S.D. Ga. Mar. 22, 2024) ("Plaintiffs assert Defendants violated their free-exercise and free-association rights. But the First Amendment 'provides an explicit textual source of constitutional protection' for these rights; thus, the First Amendment, and not substantive due process, is the proper vehicle to bring these claims." (quoting *Jordan v. Mosley*, 298 F. App'x 803, 805 (11th Cir. 2008))).

But Paul-Noel isn't just asserting free-exercise claims. He's also advancing claims under the Fourteenth Amendment's Equal Protection Clause. *See, e.g.*, Am. Compl. ¶ 18 ("Under the Fourteenth Amendment[,] the Plaintiff is entitled to *equal protection* despite being male or Catholic, all Defendants knew or should've known this, and that mistreatment to me versus other religions or gender was . . . discrimination." (emphasis added & cleaned up)). So, while the Defendants haven't weighed in on these claims, we'll analyze *both* the Plaintiff's Fourteenth Amendment equal-protection claims *and* his First Amendment free-exercise claims.

**Municipal and Supervisory Liability Claims**. Next, Paul-Noel asserts *two* municipal-liability claims against Miami-Dade County for violations of his First and Fourteenth Amendment rights. *See* Am. Compl. ¶ 50. Although Paul-Noel sues Captain Shaw and Chaplain Martin in their official capacities, we agree with the Defendants that these claims are duplicative of his claims "against the County" and therefore dismiss them now. MTD at 9 n.7; *see also Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury. We therefore

5

affirm the district court's decision to grant a directed verdict in favor of Walsh, Mays, Paden, and Noble as officially named defendants, because the City of Orlando remained as a defendant.").

And, since Paul-Noel is proceeding *pro se*, we've liberally construed the Amended Complaint as *also* asserting *two* supervisory-liability claims against Captain Shaw under the First and Fourteenth Amendments. *Cf. Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("We . . . construe the complaint liberally because it was filed *pro se*." (citing *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006))).

**Federal- and State-Law Negligent Hiring, Retention, and Training**. We'll also construe the Amended Complaint as advancing *two* counts of *federal* negligent hiring, retention, and training against the County and Captain Shaw and *two* counts of *state* negligent hiring, retention, and training. *See* Am. Compl. ¶¶ 35, 44 (alleging "negligen[t] hiring" and "retention" and "negligen[t] . . . training" against the County and Captain Shaw).

*** 

That brings us to twelve claims. Paul-Noel (it's true) also mentions the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), but we decline to construe the Amended Complaint as asserting a claim under that statute. For one thing, Paul-Noel doesn't mention RLUIPA in any of his counts. Instead, that statute comes up in passing just once in one of his thirty-three factual paragraphs. *See id.* ¶ 29 ("Under the Religious Land Use and Institutionalized Persons Act [ ] the Plaintiff['s] right to exercise [ ] his religion[ ] was unfairly restricted."). "That [Paul-Noel] referred once to RLUIPA in [a factual paragraph] is not sufficient to plead a RLUIPA claim." *Phillips v. Dixon*, 2025 WL 712824, at *1 (N.D. Fla. Mar. 5, 2025) (Winsor, J.). After all, "a RLUIPA claim is wholly separate from a First Amendment claim," *Mays v. Joseph*, 2022 WL 18981, at *2 (11th Cir. Jan. 3, 2022), and

6

these claims are governed by different legal standards.[3] Besides, Paul-Noel doesn't even say *which* defendant he's sued with this putative RLUIPA claim. We require *pro se* plaintiffs to assert their claims "with such clarity and precision that the defendant will be able to discern *what* the plaintiff is claiming"—and from whom he's seeking relief—"to frame a responsive pleading." *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (emphasis added). Since Paul-Noel hasn't done that here, we won't construe him as having advanced a RLUIPA claim in his Amended Complaint.

## DISCUSSION

With all that squared away, we arrive at the MTD. The Defendants ask us to dismiss the Amended Complaint for three reasons. *First*, they argue that it's "an improper shotgun pleading" that violates the Federal Rules of Civil Procedure. MTD at 2 n.2 (citation omitted). *Second*, they claim that "statutory immunity bars [Paul-]Noel's state-law claims against" the County and Captain Shaw. *Id.* at 4. *Third*, as for Paul-Noel's First Amendment claims, they argue that Captain Shaw and Chaplain Martin "are entitled to qualified immunity" and that he hasn't adequately pled a supervisory-liability claim against Captain Shaw or a municipal-liability claim against the County. *Id.* at 6. Paul-Noel counters that "the Defendants are not entitled to qualified immunity or statutory immunity" and that they failed to address his Fourteenth Amendment "discrimination claim[s]" and his First Amendment claims, in which he alleges that he was "being deprived of religious mandated activity[.]" Resp. at 2–3.

---

[3] *First*, RLUIPA does more than mirror the First Amendment—it broadens protection to reach any "religious exercise," and it "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). *Second*, it sharply raises the government's burden: Once a substantial burden is shown, the government must prove that its action is "in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." *Id.* at 714.

After careful review, we **DISMISS** the Amended Complaint. *First*, we find that the Amended Complaint isn't a shotgun pleading. *Second*, we dismiss Paul-Noel's individual constitutional claims against Captain Shaw and Chaplain Martin for failure to state a claim. *Third*, we dismiss his supervisory claims against Captain Shaw and his municipal claims against the County as both abandoned and insufficiently pled. *Fourth*, for the same reasons, we dismiss Paul-Noel's negligent-hiring, negligent-retention, and negligent-training claims—to the extent they're even cognizable under § 1983. Lastly, because dismissing the individual, supervisory, and hiring (or training) claims eliminates all the federal questions in this case, we won't screen the remaining state-law claims.[4]

## I.    The Complaint Isn't a Shotgun Pleading.

"In [shotgun-pleading] cases, it is particularly important for district courts to undertake the difficult, but essential, task of attempting to narrow and define the issues from the earliest stages of litigation." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997); *see also Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) (encouraging "a district court that receives a shotgun pleading [to] strike it and instruct [the plaintiff] to replead the case—even if the other party does not move the court to strike the pleading" (citation omitted)).

---

[4] One more thing. We won't convert the MTD into a motion for summary judgment, even though the Defendants have attached some documents to it. When the documents attached to a motion to dismiss are "central to the plaintiff's claim" and "undisputed," we treat them as incorporated by reference. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024) (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)); FED. R. CIV. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion"). Here, the Defendants attached three documents to their MTD:  (1) a "return receipt for unauthorized mail" that was issued to Paul-Noel when he was denied his prayer beads, Return Receipt [ECF No. 18-1]; (2) the policies of the TGKCC mail clerk, *see* Mail Clerk Policies [ECF No. 18-2]; and (3) MDCR's policies concerning the rights of "incarcerated inmates to practice their religion," Inmates and Religion Policies [ECF No. 18-3] at 1. All these documents are obviously central to Paul-Noel's First Amendment claims, and they're undisputed. Indeed, far from challenging the authenticity of these documents, Paul-Noel attached most of MDCR's religion-based policies to—and thus incorporated them into—his Amended Complaint. *See* Am. Compl. at 43, 47–57.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). It must also "state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings fall into four categories. In the words of the Eleventh Circuit, a complaint is a shotgun pleading if it:

> (1) contains multiple counts where each count adopts the allegations of all preceding counts; (2) is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) fails to separate into a different count each cause of action; or (4) asserts multiple claims against multiple defendants without specifying which defendant is responsible for which act.

*Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1322–23). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

The Amended Complaint is a shotgun pleading, the Defendants tell us, because it "contains 12 pages of hand-written facts in a stream of consciousness manner" with "all the facts incorporated into each cause of action." MTD at 2 n.2. It's true that Paul-Noel restates all his factual paragraphs in each claim. *See, e.g.*, Am. Compl. ¶ 34 (realleging "the allegations set forth in paragraphs 1–33 above" in his claim "against Miami-Dade County for negligence"); *id.* ¶ 43 (realleging "the allegations set forth in paragraph[s] 1–33 above" in his claim "against MDCR Captain R. Shaw for negligence"); *id.* ¶ 50 (realleging "by reference paragraph[s] [ ] 1 through 33" in his claims against "defendants Miami-Dade County, R. Shaw, [and] J. Martin" for violations of the "Plaintiff's First Amendment rights to freely exercise his religious belief[s] as well as his Fourteenth Amendment [right] to be free from discrimination").

Still, for two reasons, the Amended Complaint isn't a shotgun pleading. *First*, Paul-Noel hasn't pled his claims in such a way that "each count adopts the allegations of all preceding counts." *Weiland*, 792 F.3d at 1324. He's simply re-alleged each factual paragraph into each count. And, while that might "look[ ], at first glance, like the most common type of shotgun pleading," the Eleventh Circuit has said that "it is not," since "[t]he allegations of each count are not rolled into every successive count on down the line." *Ibid.*

*Second*, although the Defendants claim that Paul-Noel engaged in "stream of consciousness" pleading, we disagree. For one thing, he's numbered all his factual paragraphs. And, while not all of them are "limited as far as practicable to a single set of circumstances," FED. R. CIV. P. 10(b), we don't think he's stated his facts in a "stream of consciousness manner," as the Defendants suggest, MTD at 2 n.2; *cf. Cronin v. Davis*, 2025 WL 417718, at *4 (M.D. Fla. Feb. 6, 2025) (Scriven, J.) (finding that the complaint was "relatively straightforward and easy to comprehend" where the plaintiff "set[ ] out his factual allegations in numbered paragraphs, provide[d] a chronology of the allegedly inadequate treatment he received[,]" "explain[ed] the role of each Defendant in his medical care[,]" and "identifie[d] four Causes of Action" (cleaned up)). For another, Paul-Noel directs most of his allegations to the Defendants by name, describes what each Defendant did wrong, and lists each claim (and its underlying legal theory) against each Defendant *several* times. This is plainly sufficient to give the Defendants adequate notice of his claims, since they were able to produce a motion to dismiss that *mostly* tracked his substantive allegations. *See, e.g., Coker v. Warren*, 660 F. Supp. 3d 1308, 1321 n.7 (M.D. Fla. 2023) (Howard, J.) (declining to "dismiss Coker's pleading on shotgun grounds" where, "despite the pleading defects, Defendants were able to address Coker's claims on their merits"). We therefore won't dismiss the Amended Complaint as a shotgun pleading.

### II.     The Individual Constitutional Claims Fail.

But the merits are a different story. We'll start with Paul-Noel's individual constitutional claims under the First and Fourteenth Amendments against Captain Shaw and Chaplain Martin.

### a.   The First Amendment Subclaims

Paul-Noel appears to advance *two* First Amendment subclaims in his Amended Complaint. In the first, he alleges that the Defendants interfered with his right to practice his religion freely by withholding his chosen prayer beads. *See* Am. Compl. ¶ 10 ("[T]he mail clerk . . . alleged that he spoke with the Defendant Captain R. Shaw and the reason for the rejection was because the items could be used as weapons[.]"); *see also id.* ¶ 12 (alleging that being restricted to "the plastic rosary" of Chaplain Martin's "choosing . . . obstructed [his] freedom to practice [his] religion"). In the second, he claims that his free-exercise rights were violated because, for four weeks, (1) no Catholic leader visited him, and (2) his requested Catholic services were unjustifiably delayed. *See id.* ¶ 15 ("As of July 17th of 2025 neither of the listed Defendants have contributed to the Plaintiff[']s request for religious services such as Catholic mass[.]"). As to both subclaims, Paul-Noel hasn't plausibly stated a violation of his free-exercise rights against the Defendants.

### 1.   Subclaim One: Prayer Beads

In Subclaim One, Paul-Noel alleges that the Defendants violated his free-exercise rights by denying him his wooden prayer beads without offering an alternative. The Defendants say that they're entitled to qualified immunity because (1) "Captain Shaw and Chaplain Martin did not violate [Paul-]Noel's First Amendment rights," MTD at 11; and (2) even if he "had alleged a violation of his constitutional rights, he has not alleged that such rights were clearly established at the time of the incident," *id.* at 15. We agree with the Defendants that Paul-Noel hasn't sufficiently pled a free-exercise violation here. "Because [Paul-Noel] does not plead facts sufficient to state a [§] 1983 claim[,]" we

won't "reach the issue of qualified immunity." *Lozman v. City of N. Bay Vill.*, 2008 WL 11411194, at *3 (S.D. Fla. Apr. 14, 2008) (Altonaga, J.).

"To state a claim under the First Amendment's Free Exercise Clause, a plaintiff must plead facts showing a substantial burden on a sincerely held religious belief."[5] *Robbins v. Robertson*, 782 F. App'x 794, 801 (11th Cir. 2019). Generally, "an individual's exercise of religion is substantially burdened if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004). In the prison context, however, a restriction on an inmate's First Amendment rights "is permissible if it is reasonably related to legitimate penological interests." *Prison Legal News v. McDonough*, 200 F. App'x 873, 877 (11th Cir. 2006); *see also Johnson v. Brown*, 581 F. App'x 777, 780 (11th Cir. 2014) ("Thus, a 'prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable.'" (quoting *Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000))). To determine whether a prison's regulation is "reasonably related to legitimate penological interests," we apply the four-factor test the Supreme Court outlined in *Turner v. Safley*, 482 U.S. 78 (1987) (the "*Turner* factors"):

> (1) whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional rights that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted rights will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether there are "obvious, easy alternatives" to the prison's policy that would accommodate the prisoner's religious beliefs.

---

[5] We presume that Paul-Noel's Catholic faith is a sincerely held religious belief, and the Defendants don't suggest otherwise. *See generally* MTD.

12

*Davila v. Gladden*, 777 F.3d 1198, 1212 (11th Cir. 2015) (quoting *Turner*, 482 U.S. at 89–90).[6] In our

Circuit, we don't balance these factors "to see if some outweigh the others." *Rodriguez v. Burnside*, 38

F.4th 1324, 1331 (11th Cir. 2022) (citing *Beard v. Banks*, 548 U.S. 521, 532–33 (2006)). "The last three

factors are valuable because they provide more angles from which to view the fundamental inquiry:

whether the prison regulation is reasonably related to legitimate penological interests." *Ibid.* (citing

*Turner*, 482 U.S. at 89). But "[i]f that rational connection is missing, 'the regulation fails, irrespective

of whether the other factors tilt in its favor.'" *Ibid.* (quoting *Shaw v. Murphy*, 532 U.S. 223, 229–30

(2001)). "And if the connection exists, the policy will stand." *Ibid.* (citing *Beard*, 548 U.S. at 533).

In applying the *Turner* factors, we'll rely principally on the Eleventh Circuit's published

decision in *Davila*, which rejected a First Amendment challenge on very similar facts. In *Davila*, a

prisoner who practiced Santeria asked "to have his personal Santeria necklaces and Cowrie shells

delivered to him in prison by his goddaughter[.]" *Davila*, 777 F.3d at 1202. Davila believed that the

beads were "infused with a spiritual force called 'Ache,'" and that "wearing beads and shells that ha[d]

not been infused with Ache would be useless, if not blasphemous." *Ibid.* Davila's request was denied.

The prison's chaplain explained "that religious items must be received only from approved vendors

listed in the prison catalog," and that, "for the purpose of security," friends and family were

"prohibited" from "send[ing] in religious articles for inmates[.]" *Id.* at 1202–03 (cleaned up). Davila

objected on the ground that the bead necklaces and Cowrie shells offered in the existing catalog "ha[d]

---

[6] Although *Turner* arose in the prison context, courts have applied its framework to the constitutional claims of pretrial detainees like Paul-Noel. *See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) (applying the *Turner* factors to a pre-trial detainee's free-exercise claim); *see also United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000). We don't see any reason to depart from that trend here. The main difference between the pre-trial and post-trial contexts is that, in the former, jails can't justify their policies by pointing to penological interests—like rehabilitation and punishment—that obviously don't apply to people who are still clothed in the presumption of innocence. *See McGinnis v. Royster*, 410 U.S. 263, 273 (1973) ("[I]t would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence."). As we'll explain, however, the MDCR policy at issue here is premised on the jail's need to provide security and ensure good order, so we think *Turner* applies with equal force to our facts.

not been infused with Ache[.]" *Id.* at 1203. Like Paul-Noel, Davila alleged that prison officials violated his First Amendment rights by denying him his preferred beads. *Ibid.*

The Eleventh Circuit disagreed. In the court's view, Davila satisfied only the second *Turner* factor because he "ha[d] no alternative means of obtaining beads and shells with Ache." *Id.* at 1213. But the three other factors weighed heavily against him. *First*, the court held that there was "a valid, rational connection between the Defendants' prohibition of all mailed religious items and a legitimate government interest" in prison "safety and resource allocation[.]" *Id.* at 1213. *Second*, it reasoned that "allowing prisoners to receive religious items from outside the prison" would "indisputably impact the use of the prison's resources" and staff. *Id.* at 1213–14. *Third*, it concluded that there was no "obvious, easy alternative" to accommodate Davila's request because, while "[t]he only alternative that would allow [Davila] to obtain his beads and shells [would be] to permit prisoners to receive religious items from outside the prison," this would have "result[ed] in a more than '*de minimis*' cost to the prison's interest." *Id.* at 1214. The Eleventh Circuit therefore determined that Davila "ha[d] not established a First Amendment violation[.]"[7] *Ibid.*

We reach a similar result here. We'll start with *Turner*'s first factor—the "fundamental inquiry." *Rodriguez*, 38 F.4th at 1331. Our Defendants followed the same kind of mail policy the Eleventh Circuit upheld in *Davila*. Paul-Noel says that Captain Shaw and Chaplain Martin violated his rights by denying him the prayer beads his family sent because of an MDCR policy that forbids inmates from receiving "non-paper" items by mail. The purpose of MDCR's policy, which prohibits the receipt of "non-paper items," such as "jewelry," is "[t]o maintain good order and security within [its] facilities[.]" Mail Clerk Policies at 5. Like the goal of "safety and resource allocation," a jail's goal of maintaining good order

---

[7] Although *Davila* was decided at summary judgment, we find its application of the *Turner* factors to very similar facts instructive. In any event, courts routinely apply the *Turner* factors at the motion-to-dismiss stage. *See Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (instructing the district court to apply the *Turner* factors to "evaluate[ ] [the] prisoner['s] constitutional claims" on a motion to dismiss).

and security is obviously a legitimate governmental objective, and the connection between that objective and prohibiting the receipt of jewelry from outside the jail is "not so remote as to render the . . . policy arbitrary or irrational." *Davila*, 777 F.3d at 1213 (quoting *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996)). Jail officials—not federal judges—are in the best position to decide, absent policies that are obviously "arbitrary or irrational," *ibid.*, which sorts of items, if allowed into the jail, would endanger jail security, *see Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (citations omitted)). We therefore disagree with Paul-Noel's view that "neither a [necklace] [n]or [a] bracelet can be used as a weapon or harmful to oneself[,]" Am. Compl. ¶ 22, because the policy reasonably accounts for the hidden risks and potential misuse of these wooden items.

Paul-Noel fares no better on the other three *Turner* factors. Unlike what the court found in *Davila*, the second *Turner* factor cuts against our Plaintiff because he hasn't shown that he lacked an alternative means to exercise his faith. After all, Chaplain Martin gave him a plastic rosary in lieu of his wooden beads. Yes, Paul-Noel insists that "the[re] are different types [of rosaries] for different devoted Catholics," and that being "forced" to use a plastic one "obstructs [his] freedom to practice [his] religion." Am. Compl. ¶¶ 12, 24. But to show that he was substantially burdened, Paul-Noel must plausibly allege that the Defendants "deprived [him] of *all means* of practicing his religion." *McCorkle v. Johnson*, 881 F.2d 993, 996 (11th Cir. 1989) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)). He must allege, in other words, that receiving a plastic rosary instead of a wooden one is tantamount to being "deprived of all forms of religious exercise," *O'Lone*, 482 U.S. at 351–52, in the way that Davila "ha[d] no alternative means of obtaining beads and shells with Ache," *Davila*, 777 F.3d at 1213. Paul-Noel hasn't made that showing. The Amended Complaint doesn't explain how a plastic rosary

15

prohibits Paul-Noel from properly exercising his faith—much less why *only* a wooden rosary would do. *Cf. Frazier v. Kuhn*, 2025 WL 1895542, at *2 (3d Cir. July 9, 2025) (noting that "Frazier does not explain why a shorter chain and plastic rather than metal clips impair his ability to freely practice his religion," and that he therefore couldn't show "that he is likely to succeed on the merits" of his First Amendment claim). It's not for a "secular, civil court" to "determine the place of a particular belief . . . or the plausibility of a religious claim." *Davila*, 777 F.3d at 1204 (cleaned up). The burden of pleading the importance of a certain religious belief or requirement rests with the plaintiff, and Paul-Noel has failed to carry that burden here. *Turner*'s second factor therefore cuts against him.

The third and fourth *Turner* factors also favor the Defendants. Starting with the third, Paul-Noel proposes that, rather than a categorical ban on receiving jewelry, the "safety lieutenant [should] check the contents and material of . . . religious beads" "coming in the jail" to determine whether they're safe. Am. Compl. ¶ 26. But implementing this system would impact prison resources and staff—precisely the kind of impact *Davila* forecloses. *See Davila*, 777 F.3d at 1213–14 (observing that, "regardless of whether the prison here has an existing system of processing items from outside the prison, allowing more items through that process would indisputably impact the use of the prison's resources" and noting that "such a meager showing is all the First Amendment requires").

As for the fourth, we can't say that there are "obvious, easy alternatives" to MDCR's policy of preventing prisoners from receiving non-paper items by mail that would "fully accommodate" Paul-Noel's request for his chosen prayer beads. MDCR's policies make clear that "[a]n inmate may maintain in his/her possession faith-based items; e.g. plastic rosary, plastic Star of David, etc., that are provided at no cost by the Chaplain's Office through donations from community faith-based organizations," so long as those faith-based items don't "pose a safety or security risk[.]" Inmates and Religion Policies [ECF No. 18-3] at 8. Providing inmates with donated plastic rosaries would seem to be the "obvious, easy alternative" to, say, depriving them of *all* faith-based items. That's what

happened here. Consistent with this policy, Chaplain Martin loaned Paul-Noel a plastic rosary, and Paul-Noel concedes that other beads could be "purchase[d] via [the] commissary," although they were "not available" when he tried to get them. Am. Compl. ¶ 10.[8] But, if the only way to accommodate Paul-Noel's request for his chosen beads would be to allow him to receive non-paper items from outside the jail by mail, that would seem to impose "more than a *de minimis* cost" on the Defendants. *Davila*, 777 F.3d at 1214 (cleaned up). In short, Subclaim One fails under the four *Turner* factors, so Paul-Noel can't allege a constitutional deprivation over the denial of his chosen prayer beads. We therefore **DISMISS** Subclaim One.[9]

### 2.   Subclaim Two:  Religious Services and Leaders

As best we can tell, Paul-Noel also alleges that Chaplain Martin and Captain Shaw unjustifiably denied him two religious accommodations for at least four weeks: *the first*, visits from "a religious leader of the Catholic church"; and the *second*, the chance to participate in "religious services consistent with the Catholic religion."[10] Am. Compl. ¶ 21; *see also ibid.* ("It is the Chaplain['s] duty per MDCR

---

[8] Although Paul-Noel generally claims that, one time, the beads he wanted were "not available" at the commissary, he never says that he looked for them more than once, that they're consistently unavailable, or that the jail is using the potential availability of wooden beads—which are *actually* not available—as a bait-and-switch to circumvent his constitutional rights.

[9] We won't give Paul-Noel leave to amend Subclaim One. "[A] district court need not grant leave to amend when . . . a more carefully drafted complaint could not state a claim." *Woldeab v. DeKalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) (cleaned up). And the Eleventh Circuit has said that a prison regulation (like MDCR's mail policy) "will stand" once the court finds a "rational connection" between the policy and "legitimate penological interests" under *Turner*'s first factor. *Rodriguez*, 38 F.4th at 1331. The other *Turner* factors cannot change that result because, at least in our Circuit, "we don't balance [the *Turner*] factors to see if some outweigh the others." *Ibid.* And Paul-Noel cannot plead any new facts that would break the link between MDCR's mail policy and its valid security interests. *See Turner*, 482 U.S. at 89. Our conclusion rests on MDCR's written policy, whose authenticity Paul-Noel never disputes. And that policy, as we've said, serves the same interest in prison order and security as the regulation the Eleventh Circuit upheld in *Davila. See Davila*, 777 F.3d at 1213. Because the policy *as written* passes muster under *Turner*'s first factor—and therefore survives First Amendment review— no additional facts would change our conclusion. We therefore won't give Paul-Noel leave to amend Subclaim One. That said, Paul-Noel may assert a RLUIPA claim based on these same facts in his second amended complaint if he wishes.

[10] Paul-Noel, recall, said that he hadn't received religious services "as of July 17[,] 2025," Am. Compl. ¶¶ 15, 21, and he filed the Amended Complaint on August 19, 2025, *id.* at 22.

[policy] to cordinate [sic] all rituals and religious activity[.]"); *id.* ¶ 22 ("It was the responsibility . . . of the Defendant R. Shaw to allow religious leaders and volunteers to enter the facility.").

The Defendants haven't addressed Subclaim Two at all, *see generally* MTD, which requires us to make two preliminary points. *First*, although this subclaim is unchallenged, the Prison Litigation Reform Act *requires* us to "review, before docketing, if feasible or, in any event, *as soon as practicable after docketing*, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a) (emphasis added). This directive applies even to cases removed from state court. *See Green v. Sec'y, Fla. Dep't of Corr.*, 618 F. App'x 655, 656 (11th Cir. 2015) (affirming the district court's dismissal of the plaintiff's amended complaint under 28 U.S.C. § 1915A after the defendant "removed the complaint to federal court"). *Second*, because the Defendants haven't challenged Subclaim Two, we won't apply the *Turner* factors here, since we don't know how the Defendants would try to justify their alleged conduct. *See Johnson v. Brown*, 581 F. App'x 777, 781 (11th Cir. 2014) (reversing the district court's screening-stage application of the *Turner* factors to a prisoner's free-exercise claim and explaining that, "because[,] at the § 1915A preliminary-screening stage, the defendants have not yet . . . responded to Johnson's allegations, we do not know what justifications they may provide for these alleged actions"). Unlike Subclaim One, then, "the facts surrounding the [D]efendants' justification for their alleged interference with [Paul-Noel]'s religious practices [under Subclaim Two] must still be developed before a determination can be made as to whether the [D]efendants acted reasonably." *Ibid.* But we don't need to get into the *Turner* factors here because Paul-Noel hasn't pled enough facts to show that his free-exercise rights were substantially burdened.

In adjudicating this subclaim, we must determine whether Paul-Noel had an "alternative means of exercising" his faith, *Pope*, 101 F.3d at 1384 (quoting *Turner*, 482 U.S. at 89–91), or whether he was "deprived of all means of practicing his religion," *McCorkle*, 881 F.2d at 996. We should start

18

by acknowledging that Paul-Noel's allegations, if true, are concerning. In essence, he says that the Defendants denied him access to a Catholic leader—we'll assume for now that he means a priest—for about a month. During that same period, he claims that the Defendants deprived him of necessary Catholic services altogether. These claims, if true, are troubling because prison officials must at least make a "good faith accommodation of the [inmate's free-exercise] rights in light of practical considerations." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997). True, prison officials need not "hire a minister of every faith to conduct religious services for prisoners" or "drum up volunteers." *Wilson v. Moore*, 270 F. Supp. 2d 1328, 1351 (N.D. Fla. 2003) (Stafford, J.). But they may not "impede a prisoner's effort to have contacts with someone from the outside who is willing to bring an important religious ceremony into the prison." *Ibid.*; *see also Shepard v. Peryam*, 657 F. Supp. 2d 1331, 1347 (S.D. Fla. 2009) (King, J.) (recognizing that, while "[c]ourts have held that jail or prison officials have no affirmative duty to provide inmates of particular faiths full time chaplains or priests," they "may fulfill their good faith efforts to accommodate an inmate plaintiff's rights through volunteers who come from the community outside the institution").

Nevertheless, our Circuit has "a heightened pleading standard" for § 1983 claims, *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1179 (11th Cir. 2009) (citation omitted), which means that a civil-rights complaint must allege facts "with some specificity" and "will be dismissed as insufficient where the allegations it contains are vague and conclusory," *Dairymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (cleaned up). And that's the problem with Subclaim Two: Paul-Noel simply leaves too many key details unclear to state a plausible claim for relief.

We'll start with his claim about the lack of religious services. He says that he requested Catholic Mass beginning on July 17, 2025, but he stops there. He never tells us that he asked for any other services, how *often* he requested them, how many were *denied*, or even whether he missed any significant religious observances. *See generally* Am. Compl. These omissions matter because a plaintiff cannot

establish a "substantial burden" without first showing that he was subjected to more than one mere cancellation. *See Williams v. Bragg*, 537 F. App'x 468, 468–69 (5th Cir. 2013) (holding that the plaintiff did not establish a substantial burden by identifying only the "occasional cancellation" of religious services); *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (holding that "an isolated incident in which a prisoner is denied the opportunity to attend a religious service" doesn't violate the First Amendment, but noting that missing required religious events, "such as Passover or Eid," is "plainly incomparable to the harm of missing one weekly religious service"); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (saying that "*[d]e minimis* burdens on the free exercise of religion are not of constitutional dimension" and holding that the defendants' "failure to accommodate Mr. Rapier's standing request for non-pork meals on three isolated occasions d[id] not give rise to liability for a constitutional violation" (citations omitted)).[11]

Paul-Noel is just as imprecise about his related claim that he was denied visits from any Catholic religious leaders. He alleges only that he hasn't met with "a religious leader of the Catholic church," and that he's only been visited by the Defendant J. Martin to discuss religious beads. Am. Compl. ¶ 21. Beyond that, he provides no details: He doesn't tell us *when* he asked for a visit, *what* kind of Catholic representative he requested, or how *frequently* he made those requests—a lack of specificity

---

[11] *See also Williams v. Scott*, 2008 WL 11318165, at *8 (S.D. Fla. Nov. 13, 2008) (White, Mag. J.) ("To establish the existence of a substantial burden, a plaintiff must show more than mere inconvenience. . . . Additionally, the alleged interference should be more than an isolated incident or short-term occurrence." (citations omitted)), *report and recommendation adopted*, 2008 WL 11318166 (S.D. Fla. Dec. 1, 2008) (Ungaro, J.); *Joe v. Nelson*, 2014 WL 2930856, at *4 (M.D. Ga. June 27, 2014) ("The single or isolated incident involving the presence of standing water on Plaintiff's floor likewise does not demonstrate a substantial burden on the exercise of his religion—even if Plaintiff 'missed' four prayers that day. Isolated acts or omissions . . . do not constitute a substantial burden on religious freedom." (citations omitted)); *Rodriguez v. Bryson*, 2019 WL 13193452, at *15 (M.D. Ga. July 10, 2019) ("Although Plaintiff was presented with the classic Hobson's choice between following his religious precepts by refusing to eat the meals and abandoning his beliefs by eating non-Halal meat[,] he was faced with the choice on only two occasions, occurring several days apart. Such a temporary and slight infraction on religious exercise is generally not considered a 'substantial' burden." (citations omitted)), *report and recommendation adopted*, 2019 WL 13193451 (M.D. Ga. Sept. 6, 2019), *aff'd*, 38 F.4th 1324 (11th Cir. 2022).

that (again) makes it impossible to tell whether he experienced anything more than a sporadic or incidental denial of his visitation rights.[12]

We'll give Paul-Noel another chance to amend. In a second amended complaint, he must specify the Catholic services he requested and the Catholic leaders he sought to see. He must also tell us how often he made those requests and whether (and how often) they were denied. And he must plead facts showing that the denial of these services and visits from religious leaders deprived him "of all means of practicing his religion." *McCorkle*, 881 F.2d at 996. We caution him, though, that he won't be able to state a claim if he was given a reasonable alternative means of practicing his faith. *See O'Lone*, 482 U.S. at 351 (explaining that, even though Muslim inmates were denied the ability to attend Jumu'ah services at a fixed time, *Turner* looks to whether inmates retain "alternative means of exercising the right," and holding that the prison's restriction was reasonable because the prisoners were not deprived of "all forms of religious exercise"); *cf. Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) ("Were it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable. That showing, however, cannot be made.").

But until he properly amends this subclaim, Circuit precedent requires us to conclude that Paul-Noel hasn't stated a plausible free-exercise violation based on the denial of religious services and visitations. So, we **DISMISS** Subclaim Two as insufficiently pled.

### b. The Fourteenth Amendment Subclaims

We'll dismiss Paul-Noel's equal-protection claims too, even though the Defendants likewise haven't addressed them. "The Equal Protection Clause of the Fourteenth Amendment commands

---

[12] Paul-Noel also fails to tie this alleged deprivation to any conduct by Captain Shaw. For example, even if Captain Shaw had some role in facilitating outside religious access, Paul-Noel never alleges that she turned away available Catholic leaders or otherwise blocked them from meeting with him in the jail. *Cf. Wilson*, 270 F. Supp. 2d at 1351 (finding no violation where officials did "nothing to impede" outside practitioners from entering the facility).

that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quotation marks omitted). "[T]o state a claim for religious discrimination under the Equal Protection Clause of the Fourteenth Amendment, 'a prisoner must demonstrate that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race[,]' religion, or national origin." *Smith v. Cell Search Team*, 2023 WL 10949786, at *2 (S.D. Fla. Oct. 31, 2023) (Martinez, J.) (quoting *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001)). Importantly, "[a] successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (citing *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) ("[P]laintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group.")). Here, Paul-Noel has brought gender-based *and* religion-based equal-protection subclaims against each Defendant.

For two reasons, Paul-Noel has failed to state a discrimination claim under either theory. *First*, he never makes the threshold showing of disparate treatment. *Second*, none of his allegations plausibly suggest that the Defendants acted with discriminatory intent. *See generally* Am. Compl. At a high level, Paul-Noel alleges only in the most conclusory way that the Defendants acted "under the color of state law in a willful[,] wanton manner," *id.* ¶ 42, but he does so without supplying any supporting facts— and that's not enough, *see Mobley v. Hicks*, 291 F. App'x 217, 220 (11th Cir. 2008) ("Allegations of unequal treatment and discriminatory motive or purpose are essential to an equal protection claim, and without them, Mobley's complaint was properly dismissed."); *Sidibe v. Cissna*, 2021 WL 9408890, at *4 (M.D. Fla. Jan. 22, 2021) (Davis, J.) (granting a motion to dismiss an equal-protection claim where, "[t]aking Plaintiff's allegations as true, he has not plead facts establishing an equal protection

claim as there are not allegations of an intent to discriminate"). And without any facts establishing a "discriminatory purpose, a mere failure of those who administer the law to treat equally all persons who violate the law does not constitute a denial of equal protection." *Kunkler v. Fort Lauderdale Hous. Auth.*, 764 F. Supp. 171, 175 (S.D. Fla. 1991) (Moreno, J.) (citing *United States v. Batchelder*, 442 U.S. 114 (1979)). Having said all that, we'll take a moment to explain why each of Paul-Noel's subclaims fails.

### 1. Subclaim One: Gender-Based Discrimination

The thrust of Paul-Noel's gender-based subclaim appears to be that the Defendants' excuse for why "no Catholic mass has been . . . held" was that there were no "'male' volunteers" available. Am. Compl. ¶ 15. But he alleges that, "[t]hroughout each of the facilities of MDCR[,] different religious gatherings are held despite gender . . . classification," and that "[e]ven the administrative segregation females . . . have religious service or 'church.'" *Ibid.* Based on these observations, Paul-Noel believes that Chaplain Martin failed to render Catholic services to him while he was in administrative segregation because he is a man. And he faults Captain Shaw for all this because she, as Chaplain Martin's supervisor, "should've known that [Chaplain] Martin was unfit for service." *Id.* ¶ 45. Paul-Noel's gender-based subclaim triggers intermediate scrutiny, meaning that "[a] gender-based classification violates the Equal Protection Clause of the Fourteenth Amendment if the classification is not substantially related to the achievement of important governmental objectives." *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 616 (11th Cir. 1995) (citing *Personnel Adm'r v. Feeney*, 442 U.S. 256, 273 (1979)).

We'll accept for now Paul-Noel's contention that the Defendants classified him based on his biological sex. After all, Paul-Noel tells us that, when he confronted the Defendants about his lack of access to Catholic mass, their excuse was that there weren't any "male volunteers" available for him. Am. Compl. ¶ 15. Still, there are two problems with Paul-Noel's gender-based subclaim. *First*, Paul-

Noel hasn't shown, with facts, that this classification lacks a substantial relation to an important governmental interest, which he'll have to do in a second amended complaint. So, for instance, if MDCR has a policy of segregating its volunteers by gender, and if the Defendants relied on that policy to deny Paul-Noel the chance to attend a Catholic mass with an available female volunteer, then Paul-Noel must show why that policy doesn't advance an important governmental interest (such as institutional security).

*Second*, in any event, Paul-Noel hasn't shown that male inmates were treated worse than female inmates. It's true that a "discriminatory purpose may often be inferred from the totality of the relevant facts," *Washington v. Davis*, 426 U.S. 229, 242 (1976), and that relevant allegations may include "better treatment of similarly situated persons outside the plaintiff's class[ ] or pretext in the justification offered for the [challenged] official action," *Red Door Asian Bistro v. City of Fort Lauderdale*, 2023 WL 5606088, at *7 (11th Cir. Aug. 30, 2023) (per curiam). Here, when Paul-Noel asked to receive services in segregation, he "was told they [we]re waiting on a 'male' member of the Catholic community as oppose[d] to any willing volunteer[.]" Am. Compl. ¶ 27. And, while he alleges that females in administrative segregation still receive "religious service[s]," *id.* ¶ 15, he *doesn't* allege that female inmates received services from volunteers of *either* sex in a way that would suggest they were treated differently (and better) than male inmates, *see, e.g.*, *Mosseri v. Am. Red Cross*, 2006 WL 8432559, at *4 (S.D. Fla. June 21, 2006) (Middlebrooks, J.) (rejecting equal-protection claim challenging the Red Cross's sex-segregation policy where the complaint alleged only that the plaintiff "had to abandon his electrical outlet" and included "not even an allegation" that outlets were more plentiful in the women's section or that men were "treated differently or adversely affected"). So, in his second amended complaint, Paul-Noel must allege *specific* facts showing that female inmates in administrative segregation received religious services under the same or similar conditions in which male inmates were denied those services. For example, Paul-Noel can allege that female inmates received services

24

from *both* male and female volunteers, that female inmates received religious services more regularly than male volunteers, and any other facts showing that male inmates faced burdens female inmates *didn't* face. We therefore **DISMISS** Subclaim One for failure to state an equal-protection claim of gender-based discrimination.

### 2.   Subclaim Two: Religion-Based Discrimination

Paul-Noel's religion-based-discrimination subclaim comes in two parts. *First*, he alleges that, while he wasn't permitted to have the wooden "religious beads of his choosing[,]" the Defendants don't "enforce this 'policy' on Muslims who wear wooden beads throughout the facility." Am. Compl. ¶ 28. *Second*, he claims that a Jewish inmate received visits from a rabbi, even as he (Paul-Noel) was denied visitation by a Catholic priest. *See id.* ¶ 15 ("The rabbi has also visited my current housing unit for one (1) inmate, because per policy it did not raise security concerns to provide religious activity for (1) inmate."). In these two ways, Paul-Noel says, the Defendants discriminated against him because he is Catholic. We don't think Paul-Noel has done enough to proceed on this subclaim either.

*First*, Paul-Noel hasn't shown that he was similarly situated to the Muslim inmates who carried wooden beads. We certainly understand that it would seem to make little sense for the Defendants to deny Paul-Noel wooden beads while allowing other inmates to possess them. *See, e.g.*, Am. Compl. ¶ 26 ("To allow inmates of one religious versus another to possess wooden beads is unjust and not justified by an[y] security concern[.]"). But recall that Paul-Noel's claim is that his facility denied his specific request for wooden beads because his beads were being *shipped* to him from *outside* the jail, and it was this *importation* of non-paper items into the jail that violated a policy we've already upheld. Notably, Paul-Noel never alleges that the Muslim inmates were permitted to *import* wooden beads that were *shipped* to them from *outside* the jail in violation of this same policy. Without a similarly situated comparator, Paul-Noel can't plausibly show unequal treatment under the Fourteenth Amendment. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) ("If the plaintiff has not

been treated differently than a similarly situated comparator, no Equal Protection violation exists." (citing *Dawson v. Scott*, 50 F.3d 884, 892 (11th Cir. 1995))); *see also Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1227 (11th Cir. 2019) ("Ordinarily, . . . a similarly situated comparator [ ] will have engaged in the same basic conduct (or misconduct) as the plaintiff." (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580, 583 (6th Cir. 1992))). In his second amended complaint, then, Paul-Noel must plead facts showing that he was similarly situated to the Muslim inmates who were allowed to wear wooden beads.

*Second*, Paul-Noel hasn't shown that the Jewish inmate who received visits from a rabbi was treated better than he was. Paul-Noel alleges that the Defendants denied his requests for "Catholic mass" or visits from a Catholic religious leader because there were no available "male" volunteers. Am. Compl. ¶ 15. And we're troubled, to be sure, by the allegation that a Jewish inmate nevertheless received visits from a rabbi. That allegation *could* suggest that male religious volunteers were made available to some inmates but not to Paul-Noel. But, to draw that inference, Paul-Noel would have to allege that, while the Jewish rabbi and the Catholic priest were *both* available, only the rabbi was allowed to visit the Jewish inmate. Otherwise, we're left with to wonder whether the only reason Paul-Noel didn't get to see a priest is that no such priest was available. Paul-Noel thus hasn't alleged enough facts for us to infer that the Defendants *purposely* denied him access to a priest *because* he is Catholic—which he must do to state a plausible equal-protection claim. *See, e.g.*, *Mobley*, 291 F. App'x at 220 (affirming the dismissal of a plaintiff's equal-protection claim where, although the plaintiff "allege[d] the [the defendant]'s actions were unfair and unequal, he did not offer any facts showing that . . . there was a discriminatory motive or purpose on [the defendant]'s part"). So, in his second amended complaint, Paul-Noel must plead specific facts showing that the Defendants made male religious volunteers available to inmates of other faiths, but denied similar access to him *because* he is Catholic. Without this, his religion-based subclaim fails to state a plausible equal-protection claim.

\*     \*     \*

26

One more thing. Paul-Noel has requested *both* monetary damages and injunctive relief. *See* Am. Compl. ¶¶ 54–56 (seeking a "permanent injunction ordering the Defendants to cease all . . . wrongdoing" along with "compensatory damages" and "punitive damages . . . against each Defendant"). Of course, he's not entitled to relief on *any* of his substantive allegations because, as we've said, he's failed to identify a plausible constitutional violation. But we note that his claims for *injunctive* relief fail for the additional reason that, after he filed his Amended Complaint, Paul-Noel was transferred to another jail. "[T]he general rule in this circuit is that a prisoner's transfer to another facility will moot the prisoner's claims for injunctive and declaratory relief." *Jackson v. Ellis*, 2009 WL 2579394, at *3 (N.D. Fla. Aug. 18, 2009) (Collier, J.) (citing *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007)). A case can become moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). That's the case here. Paul-Noel made his requests for injunctive relief when he was at TGKCC, Am. Compl. ¶ 54, but he's no longer there, *see* Resp. at 4 (indicating that Paul-Noel resides at Metro West Detention Center at "13850 N.W. 41st Street," Doral, Florida, "33178"). So, his request for an injunction against the individual Defendants is **DENIED as moot**. *See, e.g., Jackson*, 2009 WL 2579394, at *3 ("[S]ubsequent to filing his Fourth Amended Complaint, Jackson was transferred to Florida State Prison, where he is presently housed. To the extent the specific conduct alleged by Jackson in the Fourth Amended Complaint is limited to events that took place at SRCI and thus could not reasonably be expected to recur at Florida State Prison, Jackson's equal protection claim appears to be moot.").[13]

---

[13] We recognize that, to the extent the County's policies regarding inmate mail and religious services are effective county-wide, it's possible that some or all of Paul-Noel's claims for injunctive relief "may not have been mooted by his transfer." *Jackson v. Ellis*, 2009 WL 2579394, at *3 (N.D. Fla. Aug. 18, 2009) (Collier, J.). As we'll explain, however, we don't think he's stated a plausible claim of municipal liability against the County in any event.

### III.    The *Monell*[14] and Supervisory-Liability Claims Fail.

We turn, then, to Paul-Noel's municipal and supervisory claims against the County and Captain Shaw. The Defendants argue that Paul-Noel "does not meet the pleading standard for municipal liability . . . as to the County," MTD at 6, and that, for similar reasons, his "supervisory liability claim against Captain Shaw must be dismissed," *id.* at 15. We agree. Since his claims against Captain Shaw and the County fail for similar reasons, we'll address them together.

#### a.   Standards

**Municipal Liability**. A municipality cannot be liable under *Monell* unless the plaintiff "prove[s] causation by demonstrating that the municipality's deliberate conduct was the moving force behind his injury." *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004); *see also Monell v. Dep't of Social Servs. of Cty. of N.Y.*, 436 U.S. 658, 691 (1978) (holding that a municipality's custom or policy must have been the "moving force" behind the alleged constitutional deprivation). A plaintiff can accomplish this by showing that there was a "pattern of similar constitutional violations" from which "deliberate indifference [to the plaintiff's constitutional rights] can be inferred[.]" *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310–11 (11th Cir. 2011) (cleaned up); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) ("[Mercado] was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are *substantially similar* to the case at hand. For this reason, the district court did not abuse its discretion, and the dismissal of Mercado's *Monell* claim . . . should be affirmed." (emphasis added)). The custom "must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it[.]" *Craig*, 643 F.3d at 1310 (cleaned up).

**Supervisory Liability**. A sheriff may not be liable under 42 U.S.C. § 1983 unless he "personally participates in the alleged constitutional violation or . . . there is a causal connection

---

[14] *Monell v. Dep't of Social Servs. of Cty. of N.Y.*, 436 U.S. 658 (1978).

between actions of the supervising official and the alleged constitutional violation." *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013). A § 1983 plaintiff can establish this causal connection between a sheriff's actions and the constitutional deprivation in one of four ways:  (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation *and he fails to do so*"; (2) "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully"; or (4) facts support an inference that the supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360–61 (11th Cir. 2003) (emphasis added). "The failure to establish a policy or procedure for adequately training officers may constitute a 'policy' giving rise to § 1983 liability, even in cases where the supervising official was not personally involved." *Rocker v. City Of Ocala, Fla.*, 355 F. App'x 312, 314 (11th Cir. 2009) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)). "The standard for supervisory liability is extremely rigorous." *Powell v. Sheriff, Fulton Cnty., Ga.*, 511 F. App'x 957, 961 (11th Cir. 2013) (cleaned up).

### b. Analysis

For three reasons, we dismiss Paul-Noel's municipal- and supervisory-liability claims. *First*, although the Defendants *explicitly* moved for dismissal of Paul-Noel's municipal claims against the County and his supervisory-liability claims against Captain Shaw, Paul-Noel didn't oppose these arguments in his response. *See generally* Response. He's thus waived any opposition to these requests for dismissal. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (agreeing with the district court's conclusion that, "when a party fails to respond to an argument or otherwise address a claim, the [c]ourt deems such argument or claim abandoned"); *Gore v. Jacobs Eng'g Grp.*, 706 F. App'x 981, 986 (11th Cir. 2017) (affirming a district court's finding that a claim was abandoned in part because the plaintiff "failed to address or respond in any way to [the defendant's] arguments that the district court dismiss his ADEA claim"); *Gildyard v. Children's Network of Sw. Fla.*, 2025 WL 1093331,

at *7 (M.D. Fla. Apr. 10, 2025) (Chappell, J.) ("By failing to respond to Defendant's dismissal argument, Plaintiff has abandoned these claims." (citation omitted)).

*Second*, since we've determined that the Defendants didn't, in their individual capacities, violate Paul-Noel's constitutional rights, whether the County's policies were unlawful is "beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Sampson v. City of Brunswick*, 549 F. App'x 858, 861 (11th Cir. 2013) ("In this case, the City and County cannot be liable because, as we've already discussed, we've identified no violation of the plaintiffs' constitutional rights by the individual Defendants."). Likewise, because Paul-Noel has "failed to state a claim for the violation of a constitutional right, [his] supervisory claims against [Shaw] also fail." *Long v. Slaton*, 508 F.3d 576, 583 n.10 (11th Cir. 2007); *see also Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1283 (11th Cir. 2017) ("In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability.").

*Third*, Paul-Noel hasn't alleged sufficient facts under either theory of liability. We'll start with his municipal claims against the County, which fail for three reasons. *One*, the law is clear that "[a] single incident [is] not so pervasive as to be a custom or practice." *Greech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 n.6 (11th Cir. 2003) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)). And, as to all his constitutional claims, Paul-Noel has failed to allege any pattern of similar violations with respect to *other* inmates, so he hasn't come close to showing a widespread unconstitutional policy or custom. *See La Bruno v. Miami-Dade Cnty.*, 2011 WL 1103783, at *4 (S.D. Fla. Mar. 23, 2011) (Huck, J.) ("[T]o establish a custom or policy by showing a widespread and longstanding practice, the incidents that a plaintiff alleges constitute that practice 'must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999))). *Two*, as to his free-exercise claim specifically, in which Paul-Noel suggests that the County's policy prohibiting the mailing of "non-paper items" is unlawful, we've already upheld this policy under

*Turner* and *Davila*. *Three*, instead of alleging that the County is following an unconstitutional policy, Paul-Noel seems to accuse the County of *violating its own policy*. *See, e.g.*, Am. Compl. ¶ 42 (alleging that, "at all times relevant to the claims, the Defendant[ ] Miami-Dade County violated M.D.C.R. . . . policy and procedures and was acting under color [of] state law with a total disregard of the Plaintiff's constitutional right[s]" (cleaned up)). But that's the *opposite* of an unconstitutional-policy, municipal-liability claim. *See Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action *pursuant to* official municipal policy of some nature caused a constitutional tort." (emphasis added)); *Saint-Vil v. City of Miami Beach*, 2021 WL 2010184, at *4 (S.D. Fla. Apr. 5, 2021) (Torres, Mag. J.) ("Indeed, a city is liable only when *its 'official policy' causes* a constitutional violation." (quoting *Monell*, 436 U.S. at 694 (emphasis added))), *report and recommendation adopted*, 2021 WL 2010180 (S.D. Fla. May 10, 2021) (Scola, J.).

His supervisory claims against Captain Shaw also lack factual support. For one thing, the only *personal* involvement Captain Shaw purportedly had was instructing the mail clerk not to give Paul-Noel the botanica beads and failing to bring in a religious volunteer when Paul-Noel was in administrative segregation—two circumstances as to which we've already determined that Paul-Noel hasn't stated a plausible claim against her. For another, Paul-Noel hasn't pled a connection between her actions and any of Chaplain Martin's alleged violations. And he doesn't say that Captain Shaw *knew* Chaplain Martin needed additional training *either* because of some "history of widespread prior abuse" *or* because this need for training was "so obvious." *Gold v. City of Miami*, 151 F.3d 1346, 1350–52 (11th Cir. 1998). He thus hasn't properly alleged that Captain Shaw "knew of a need to [supervise] in a particular area [but] made a deliberate choice not to take any action." *Ibid.*

In his second amended complaint, then, Paul-Noel must allege *specific* facts showing that the County maintained an unconstitutional policy or longstanding custom that caused the alleged constitutional violations. This might include facts showing a pattern of similar violations involving

31

other inmates. For that matter, he must tell us whether he's actually challenging the constitutionality of an official MDCR policy itself or, instead, alleging that County employees simply failed to follow an otherwise lawful policy. As to Captain Shaw, Paul-Noel must allege facts showing either that she personally participated in a plausible constitutional violation or that a causal connection existed between her actions and Chaplain Martin's alleged misconduct. For instance, Paul-Noel should explain *with particularity* whether Captain Shaw knew of prior similar violations, whether she knew that additional supervision or training was needed, or whether she deliberately ignored a known risk of constitutional violations.

For all these reasons, we dismiss Paul-Noel's municipal-liability claims against the County and his supervisory-liability claims against Captain Shaw.

**IV.    The Negligent-Hiring, Negligent-Retention, and Negligent-Training Claims Fail.**

That leaves only Paul-Noel's claims of negligent hiring, retention, and training against the County and Captain Shaw. While Paul-Noel doesn't "specify whether . . . these claims are being brought under state or federal law," MTD at 3, the Defendants construed his claims as arising under state law, and they argue in part that "there is no cause of action for negligent hiring or retention under [§] 1983," *id.* at 4 n.5. Not so. While a claim of negligent hiring and retention *typically* arises under state law, such claims "brought against a municipality under § 1983 are not without precedent." *Paul v. Bradshaw*, 2013 WL 12084298, at *8 (S.D. Fla. Aug. 7, 2013) (Rosenbaum, J.); *see, e.g.*, *Hernandez v. Miami-Dade Cnty.*, 2021 WL 4709784, at *4 (S.D. Fla. Oct. 8, 2021) (King, J.) ("Count II is cognizable because Plaintiff may prove that inadequate training and/or supervision can amount to 'deliberate indifference' and therefore, a policy or custom." (citing *Williams v. DeKalb Cty.*, 327 F. App'x 156, 160 (11th Cir. 2009))); *Santana v. City of Hialeah*, 2009 WL 6635306, at *1 (S.D. Fla. Nov. 30, 2009) (Gold, J.) (accepting the parties' stipulation that the plaintiff's action was "a case of negligent hiring and/or training against the City of Hialeah for deliberate indifference to the constitutional rights of arrested

persons under 42 U.S.C. § 1983" (citation omitted)).[15] So, while we won't comment on what Florida law requires, we'll analyze Paul-Noel's negligent-training, negligent-hiring, and negligent-retention claims under § 1983.

Before we do so, though, we'll note again that, although the Defendants argued for dismissal of these claims, *see* MTD at 3–6, Paul-Noel never addressed their arguments in his response, *see generally* Resp. He's thus waived any arguments he could have made in defense of these counts. *See A1 Procurement, LLC v. Hendry Corp.*, 2012 WL 6214546, at *3 (S.D. Fla. Dec. 13, 2012) (Altonaga, J.) ("Failure to respond to arguments in a motion to dismiss is a sufficient basis to dismiss such claims by default[.]").

In any event, these claims fail on the merits. A § 1983 plaintiff alleging negligent hiring "must demonstrate that the municipal actor disregarded a known or obvious consequence of hiring [an] applicant." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313 (11th Cir. 2001). In fact, "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 411 (1997).

As for negligent retention, a plaintiff must similarly allege a policymaker's deliberate indifference to the risk that retaining an employee will cause a violation of a third party's civil rights. *See Totman v. Louisville Jefferson Cnty. Metro Gov't*, 391 F. App'x 454, 466 (6th Cir. 2010) ("Where a plaintiff seeks to hold a municipality liable for negligently retaining a particular employee, the plaintiff

---

[15] While the Eleventh Circuit once suggested that it's "questionable whether an alleged policy of inadequate training or negligent hiring will suffice to impose liability on a municipality for the unconstitutional actions of its police officers," *Fundiller v. Cooper City*, 777 F.2d 1436, 1442–43 (11th Cir. 1985), it hasn't barred plaintiffs from pursuing these claims under § 1983.

must prove that the decision to retain the employee 'reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" (quoting *Brown*, 520 U.S. at 411)); *Wade v. Jenne*, 2006 WL 8431547, at *1 (S.D. Fla. July 7, 2006) (Cohn, J.) (noting that a plaintiff alleging "negligent retention under § 1983" must show that the municipality was "deliberately indifferent to the rights of its inhabitants," which requires "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action" (quoting *Gold*, 151 F.3d at 1350)).

Lastly, a failure to train "can be the basis for liability under § 1983." *Gold*, 151 F.3d at 1350 (citing *City of Canton*, 489 U.S. at 387, 389–91). "The Supreme Court has instructed that these 'limited circumstances' occur only when the municipality inadequately trains or supervises its employees, this failure to train or supervise is a [policy], and that [the policy] causes the employees to violate a citizen's constitutional rights." *Ibid.*

We'll start with Paul-Noel's negligent-hiring, negligent-training, and negligent-retention claims against the County. Paul-Noel can't recover on *any* of these claims unless he "demonstrates that the municipality's official policy caused the constitutional violation." *Wade*, 2006 WL 8431547, at *1; *see also Holmes v. City of Clearwater*, 2024 WL 775210, at *6 (M.D. Fla. Feb. 26, 2024) (Barber, J.) (recognizing that a plaintiff must show in part "a policy or custom that caused the deprivation of an individual's civil rights" "[t]o establish a § 1983 negligent retention claim" against a municipality (citations omitted)). And "[Paul-Noel] can only allege the existence of a policy or custom by 'point[ing] to multiple incidents or multiple reports of prior misconduct by a particular employee.'" *Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019) (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957 (11th Cir. 2019)). But Paul-Noel has alleged *no* facts showing a widespread policy or custom of negligent hiring or retention, and he's made no attempt to identify *any* prior conduct by Captain Shaw or Chaplain Martin—apart from the isolated incidents involving him—that would have put the County

34

on notice of these two officers' systemic violations of *other* inmates' free-exercise and equal-protection rights.

As for Captain Shaw's alleged negligent hiring, training, and retention of Chaplain Martin, Paul-Noel alleges that Shaw "should've known of problems with Defendant J. Martin that indicated his unfitness for service and/or need for additional discipline, training, and supervision." *Id.* ¶ 46. And he says that, despite this knowledge, Captain Shaw "permitted . . . J. Martin to be unsupervised over inmates' religious needs," and that Paul-Noel "fell with[in] the zone of foreseeable risk." *Id.* ¶ 47. But these are just conclusory assertions. He pleads *no* facts showing that Captain Shaw ever overlooked clear warning signs in Martin's background—indeed, he tells us nothing at all about Martin's background. *See generally* Am. Compl.; *see, e.g.*, *Perera-Gonzalez v. Rodriguez*, 2021 WL 2012403, at *4 (S.D. Fla. May 20, 2021) (Scola, J.) (finding that the plaintiff's "negligent hiring" claim under § 1983 was "based on nothing more than conclusory allegations" where the plaintiff alleged that an employee was unfit by pointing to his "prior record relating to . . . excessive force" and his "lack of experience in responding to suicidal and depressed persons," but gave "no way of knowing what actual background details should have led the City to conclude that the 'plainly obvious consequence' of hiring [the employee] would have resulted in the deprivation of the constitutional rights" the plaintiff alleged). And he never explains how Captain Shaw would have been personally aware of Chaplain Martin's *prior* misconduct as a jail chaplain. *Compare Ashley v. City of Hialeah*, 2011 WL 3236051, at *4–6 (S.D. Fla. July 28, 2011) (Huck, J.) (finding that the plaintiff plausibly stated a "negligent retention" claim under § 1983 where she alleged that the city-defendant retained an employee who had "committed six acts of professional misconduct" and that the city was "aware of [the employee]'s likeliness to act in a way that would deprive a person of her rights" because it "considered [his] prior misconduct significant in its decision" to eventually terminate him), *with Edwards v. City of Fort Myers*, 2021 WL 1627475, at *6 (M.D. Fla. Apr. 27, 2021) (Chappell, J.) (dismissing the plaintiff's "negligent retention" claim under

§ 1983 where he alleged that "the City was deliberately indifferent to his constitutional right to be free from excessive force by retaining Officers Havenner and Gonzalez" but did "not allege any incidents that the City was aware of and overlooked, nor [did] he allege how the City was deliberately indifferent").

If Paul-Noel wants to reassert these claims against the County and Shaw, he should plead all these missing facts with *specificity* in his second amended complaint. For now, though, Paul-Noel has failed to state plausible negligent-training, negligent-hiring, and negligent-retention claims against the County and Captain Shaw.

### V.       We Decline to Exercise Supplemental Jurisdiction.

That leaves only Paul-Noel's state-law negligence claims. If there aren't any claims over which a district court has original jurisdiction, it may decline to exercise its supplemental jurisdiction over any remaining state-law claims. 28 U.S.C. § 1367(c)(3). "[C]onsiderations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966) (establishing these factors). The power to hear cases via supplemental jurisdiction "need not be exercised in every case in which it is found to exist." *Gibbs*, 383 U.S. at 726. As the Supreme Court has said, supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *Ibid.* Obeying the Supreme Court's admonition here, we decline to exercise our supplemental jurisdiction over Paul-Noel's state-law negligent-hiring, negligent-retention, and negligent-training claims. *See Barat v. Navy Fed. Credit Union*, 2024 WL 326445, at *6 (S.D. Fla. Jan. 29, 2024) (Altman, J.); *see also Lawson v. City of Miami Beach*, 908 F. Supp. 2d 1285, 1292–93 (S.D. Fla. 2012) (Moreno, C.J.) ("[C]onsiderations of practicality and comity counsel that a state judge is best equipped to resolve [such] state claims." (cleaned up)).

We *will*, however, let Paul-Noel file a second amended complaint so he can correct the deficiencies we've identified in his federal claims. *See Woldeab v. DeKalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) ("When a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991))). In drafting his second amended complaint, Paul-Noel must ensure that his factual allegations are properly pled, meaning that "the allegations in the complaint 'must be simple, concise, and direct,'" *LaCroix v. West. Dist. of Ky.*, 627 F. App'x 816, 818 (11th Cir. 2015) (quoting FED. R. CIV. P. 8(d)(1)), and the facts supporting his claims *must* be presented in a "short and plain statement . . . showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2). Paul-Noel must also separate each of his causes of action into separate counts, as we've explained. *See Ortiz v. Carnival Corp.*, 2020 WL 6945958, at *1 (S.D. Fla. Nov. 25, 2020) (Scola, J.) ("Each distinct theory . . . is a separate cause of action that must be asserted independently and with corresponding supporting factual assertions." (collecting cases)). We warn Paul-Noel that, if he fails to file a legally sufficient second amended complaint, we'll dismiss this case without further notice.

### CONCLUSION

We therefore **ORDER AND ADJUDGE** as follows:

1. The Defendants' MTD [ECF No. 18] is **GRANTED in part** and **DENIED in part**. Andre Paul-Noel III's Amended Complaint [ECF No. 17] is **DISMISSED without prejudice**. By **August 6, 2026**, the Plaintiff must file a second amended complaint correcting the deficiencies we've identified in this Order. The second amended complaint must be no longer than 20 double-spaced pages, must be signed under the penalty of perjury, and must contain a short and plain statement of the Plaintiff's claim for relief, a basis for federal jurisdiction, and a demand for judgment. The second amended complaint must also include a separate paragraph for each Defendant, explaining what that

Defendant did wrong, and it must present all allegations in numbered paragraphs. The Clerk is **DIRECTED** to attach a copy of this Court's form titled "Complaint for Violation of Civil Rights (Prisoner)."

2.       The second amended complaint must be labeled "Second Amended Complaint" and must include the case number referenced above, so that it will be filed in this case. The second amended complaint will be the sole, operative pleading in this case, and only the claims listed in the amended complaint will be addressed. *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1219 (11th Cir. 2007) ("[A]n amended complaint supersedes the initial complaint and becomes the operative pleading in the case."). The Plaintiff may not incorporate by reference any past claims. *See* S.D. FLA. L.R. 5.1.

3.       The Plaintiff's failure to file the second amended complaint on time and in compliance with this Court's Order shall result in this case being dismissed without further notice. *See* FED. R. CIV. P. 41(b).

4.       The stay is **LIFTED**. This case remains administratively **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on July 8, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      Andre Paul-Noel III, *pro se*
         counsel of record

38